UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH WAYNE HOWARD,  )  | 1:06-CV-1818 JMD HC |
| ) | |
| Petitioner,  ) | ORDER DENYING PETITION FOR WRIT |
| ) | OF HABEAS CORPUS |
| v.  ) | |
| ) | ORDER DIRECTING CLERK OF COURT |
| ) | TO ENTER JUDGMENT |
| ROSANNE CAMPBELL,  ) | |
| ) | ORDER DECLINING ISSUANCE OF |
| Respondent.  ) | CERTIFICATE OF APPEALABILITY |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Tulare County Superior Court. A jury convicted him of numerous sexual offenses. It was also determined that Petitioner had suffered two prior serious felony convictions and had served a prior prison term. The trial court sentenced Petitioner to 124 years to life in state prison. (Answer at 1-6.)

Petitioner filed an appeal in the California Court of Appeal. While his appeal was pending, the trial court granted the prosecutor's motion to dismiss all but three counts against Petitioner pursuant to *Stogner v. California*, which held that a California law resurrecting otherwise time-

barred sex-related child abuse crimes violated the Ex Post Facto Clause. <u>Stogner v. California</u>, 539 U.S. 607, 609 (2003). The trial court resentenced Petitioner to eighty years to life in prison. The Court of Appeal affirmed the judgment as to the remaining counts, but remanded the case for resentencing. (Answer at 6; Lodged Doc. 7.)

Petitioner filed a petition for review in the California Supreme Court. The court summarily denied review. (Answer at 6; Lodged Doc. 8.)

On remand, the trial court resentenced Petitioner to eighty-one years to life in state prison. (Answer at 6.)

Petitioner filed a second appeal in the California Court of Appeal. The court affirmed the judgment in a reasoned opinion. (Answer at 6; Lodged Doc. 9.)

Petitioner filed a second petition for review in the California Supreme Court. The court summarily denied review. (Answer at 6; Lodged Doc. 10.)

On December 13, 2006, Petitioner filed a petition for writ of habeas corpus in this Court. On April 2, 2007, Petitioner filed the instant amended petition. The amended petition raises the following three grounds for relief: 1) ineffective assistance of counsel; 2) Petitioner's rights were violated when evidence of time-barred incidents of child sexual abuse and animal cruelty were admitted into evidence; and 3) Petitioner's sentence constitutes cruel and unusual punishment.

On December 3, 2007, Respondent filed an answer to the amended petition.

On February 11, 2008, Petitioner filed a traverse to the answer.

On February 29, 2008, Petitioner filed a supplement to the traverse.

<u>Consent to Jurisdiction of Magistrate Judge</u>

On December 29, 2006, Petitioner filed a Consent to Jurisdiction of United States Magistrate Judge. (Court Doc. 4.) On November 15, 2007, Respondent also filed a Consent to Jurisdiction of United States Magistrate Judge. (Court Doc. 22.) On December 17, 2007, the Court issued a consent order reassigning the case to Magistrate Judge Gary S. Austin. (Court Doc. 29.) On November 12, 2008, the Court reassigned the case to the undersigned. (Court Doc. 35.)

# FACTUAL BACKGROUND[1]

Prosecution Evidence

Petitioner's daughter Terry was 34 years old at the time of trial. Her siblings were Becky, Dusty, Nolan, and Kenneth. The relationship between Petitioner and Terry's mother was very abusive, with constant beatings and threats, and Terry was also beaten on numerous occasions. In addition, Petitioner sexually abused Terry from the time she was three or four years old until she was eight or nine. The abuse--which occurred several times a week--included acts of sexual intercourse, and frequently started with Terry's mother leaving the house for some reason and Terry having to get Petitioner his dirty books. Terry did not tell anyone because she believed no one could stop Petitioner, and she would be killed. The entire family received beatings, in addition to which Petitioner made them watch him kill their rabbits. He would twist their necks and tell Terry and the others that he could kill them the same way. They had 30 or 40 rabbits; eventually, all were killed in this manner. In addition, Terry saw Petitioner have sex with her grandmother's two Chihuahuas, Mitsy and Zippy. Terry believed he hurt the animals in an effort to keep her quiet.

The abuse ended when Petitioner and Terry's mother separated. At some point, Terry reported the abuse, but she did not discuss it with her siblings or other relatives. After she had children of her own, she allowed Petitioner to be around them, but she never left them alone together.

Petitioner's niece Lori was 39 years old at the time of trial. When Lori was approximately seven years old, she, her mother, and her siblings moved in with Petitioner's mother. Lori's mother was gone a lot, and used Petitioner as a babysitter. Petitioner was mean, except when he molested Lori. The sexual abuse, which occurred when Lori was in second grade, included at least one act of intercourse, as well as mutual fondling. On one occasion, Petitioner fondled Lori's genitals during an outing in which Petitioner and his wife took Lori, her sister, and Petitioner's children to a drive-in. All of the children were sleeping in the back of the station wagon, and Petitioner reached over the car seat to fondle Lori. Lori could not recall whether Petitioner's wife was present or had gone to the

---

[1] The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of January 20, 2005 and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1); Lodged Doc. 7.

1   concession stand.  Lori did not tell anyone about the abuse at the time because her mother and
2   grandmother loved Petitioner, and Petitioner was mean.  She thought he might do something to her
3   brother or sister.
4          Petitioner's daughter Becky was 33 years old at the time of trial.  During her childhood,
5   Petitioner mentally, physically, and sexually abused her.  The sexual abuse--which began when she
6   was four or five years old--included mutual fondling, oral copulation, and foreign object penetration.
7   Petitioner was also physically abusive toward Becky's mother.  Because of the physical abuse Becky
8   and her mother received, Becky was afraid that if she told about what was happening, Petitioner
9   would kill her.  On one occasion, Becky, her siblings, and her mother were in the car with Petitioner.
10  Petitioner pushed Becky's mother out of the vehicle and told her that she had better run fast because
11  he was going to start killing the children.  Becky took the threats seriously, as she had seen him do a
12  lot of horrible things to everyone else.  Once, Becky saw Petitioner holding a screwdriver to her
13  mother's throat and threatening to run it through her head.  In addition, Petitioner killed pet rabbits by
14  hitting them in the head with a hammer or slamming them on something, and said it would happen to
15  the children if they did not do as they were told.  He also shot a dog belonging to the family.
16  Observing this made Becky believe Petitioner could do the same thing to her and her siblings.
17         After Becky became an adult, she did not have extensive contact with Petitioner.  However,
18  she did let one of her daughters spend the night at his house on one occasion so that the little girl
19  could play with the daughter of Petitioner and his wife Barbara.  It was Becky's understanding that
20  Barbara would be present.
21         Petitioner's stepdaughter Gayla was 27 years old at the time of trial.  She was around six
22  years old when Petitioner moved into her house and began to sexually abuse her after school, while
23  her mother was at work.  Acts included mutual fondling, digital penetration, and oral copulation.
24  Gayla did not report the abuse because Petitioner beat Gayla and her brother and was physically
25  abusive toward their mother.  He also scared Gayla by removing his glass eye.  The abuse continued
26  until Gayla was around seven or eight years old, at which point Petitioner and her mother separated.
27         Petitioner's son Kenneth was 30 years old at the time of trial.  He was five years old when his
28  parents separated and he was placed in a foster home.  He was reunited with his mother when he was

six. At some point after that, he told his mother that he wanted to have a relationship with Petitioner. Ultimately, he was successful in obtaining her permission to visit Petitioner and his wife, Barbara. Kenneth would visit them on weekends, when Barbara's children were there.

Initially, Kenneth and Petitioner had an "okay" relationship. One weekend when Kenneth was approximately 12 years old, however, Barbara and her children were not present during Kenneth's visit with Petitioner. Petitioner molested Kenneth for the first time on this occasion. Kenneth did not report the molestation because he enjoyed being part of the family relationship that existed between Petitioner and Barbara and her children, and Petitioner warned that Kenneth's mother would not let him visit anymore if he said anything. Petitioner subsequently molested Kenneth on other occasions. Acts included oral copulation (including one occasion on which Petitioner had Kenneth orally copulate both Petitioner and his friend, Carl), masturbation, and sodomy. The abuse continued until Kenneth was about 14, at which time Petitioner gave the impression that he did not want Kenneth around anymore.

Petitioner's daughter Dusty had a son, Brandon, who was 10 years old at the time of trial. Brandon was introduced to Petitioner when he was seven years old. On one occasion, Dusty, her husband Lloyd, their daughter Sarah, and Brandon attended a church potluck with Petitioner and Barbara. At one point, Brandon went to the restroom. When Lloyd inquired of Barbara concerning Brandon's whereabouts, Barbara said she would go and see what was taking him so long. She went to the rest room; when she came out, she was crying and told people she had a headache. Lloyd believed Petitioner was in the restroom with Brandon.

Although the families would get together for barbecues and the like, Brandon was only alone with Petitioner one day, ostensibly to try on clothes. Petitioner took Brandon to his (Petitioner's) bedroom. According to Brandon, he tried on the new clothes and showed them to his parents. When he went back to change into his regular clothes, Petitioner removed Brandon's new clothes, threw Brandon stomach-down on the bed, and then put what Brandon believed to be a balloon on his own penis. Petitioner covered Brandon's eyes with his hands. Barbara looked in and started crying. Petitioner then covered Brandon's eyes with gray tape and sodomized the child. Brandon tried to yell, but Petitioner had his hands over Brandon's mouth. Petitioner then put tape over Brandon's

mouth. Brandon felt Petitioner put what he believed to be handcuffs on him, cuffing his hands to the back. Petitioner then grabbed Brandon's hand and put it on Petitioner's penis. Petitioner also fondled Brandon's penis. Brandon tried to move away, but could not because Petitioner was holding him. Petitioner orally copulated Brandon. Petitioner then removed the handcuffs and went to the bathroom. Brandon put on his clothes. Petitioner helped him with the pants and tucking in his shirt. When Petitioner did this, he attempted to touch Brandon's penis, but Brandon jerked away and left the room. He was too scared to tell his parents because Petitioner threatened to hurt him and his parents.

While Brandon was in the bedroom with Petitioner, Dusty and Lloyd were in the living room. Petitioner and Brandon were in the bedroom for what Lloyd--who had trouble telling time and did not own a watch--believed to be two or three seconds. Lloyd did not hear anything unusual or see any marks on Brandon's hands, and Brandon was not crying and did not appear to be in pain when he emerged from the bedroom. However, Lloyd and Dusty noticed that Brandon acted shy around Petitioner. They stopped visiting when Petitioner became angry because they would not let Brandon spend the night with him. They were last in Petitioner's house in December 1999, and did not see him in 2000. In 2001, Brandon told Lloyd that he was scared of Petitioner. When Lloyd asked why, Brandon told what had happened. Lloyd then reported the incident to the police.

Brandon initially testified that no oral copulation took place, then that he could not remember, and then that Petitioner orally copulated him after he touched Brandon's penis. On February 6, 2001, Brandon gave a recorded interview (the CART interview) in which he claimed Petitioner orally copulated him. In the interview, Brandon related that Petitioner had sodomized Sarah. Brandon testified that he said this because Sarah had told him it happened, and he thought she was telling the truth. Brandon also told the interviewer that he saw Petitioner sodomize and rape Sarah. This was a lie. At trial, Brandon admitted making up some of what he told the interviewer because he did not feel comfortable telling her about what happened.

On February 8, 2001, police executed a search warrant at Petitioner's residence. A rifle was found in the front hall closet. A pair of handcuffs, which could be opened without a key, was found on the doorknob inside one of the bedrooms, which was identified as belonging to Petitioner's

daughter, Stacey. Two duffel bags, one black and one blue, were found inside another bedroom where Barbara, who was present, said that Nolan had been staying. Two packages of condoms were found in the master bedroom. Duct tape was found in the toolbox of a pickup truck in the garage.

Georgeanne Greene was a registered nurse whose focus, both in training and experience, was on sexual assault examinations. As of the time of trial, she had conducted nearly 400 pediatric sexual assault examinations and, for the preceding three years, she had been performing nothing but SART (Sexual Assault Response Team) examinations.

Greene examined Brandon on February 27, 2001. Brandon reported to her that his grandfather had sodomized him and touched his penis, and that Brandon had placed his mouth on his grandfather's anus and had also touched his grandfather's penis. His mother reported that he had been sexually acting out with his sister. Greene's physical examination of Brandon revealed an adhesion on his penis that could have developed from irritation or injury. He also had some irregular anal folds and scarring, and venous congestion around much of the anus. The irregularities appeared to be healed old fissures. The physical findings were consistent with Brandon's reported history of sodomy, although it was possible they came from some other event. Because they were healed, it was impossible to tell when they occurred.

<u>Defense Evidence</u>

Petitioner's adult stepdaughter, Carrie, lived with Petitioner and her mother part-time from the age of 5 to the age of 13, and then fulltime until the age of 18. Petitioner never touched her inappropriately or acted in a sexually inappropriate manner toward her, nor did she ever see him act in a sexually inappropriate way with her sister, Stacey; her daughter, Cheyenne; or any other child.

The gun found during the search of Petitioner's residence belonged to Carrie's husband. Barbara had given him permission to leave it in the closet. Petitioner was not present when the gun-- which was not loaded--was placed there. Carrie never saw Petitioner handle the gun. The gun had been in the closet about a month when Petitioner was arrested. Petitioner did not use that closet, and Barbara and her son-in-law both forgot the gun was there.

Petitioner's teenaged daughter, Stacey, was left alone with Petitioner "[a] lot" while she was growing up. At no time did he touch her in a sexually inappropriate way or act inappropriately

toward her.  Sometimes Petitioner would be present when Stacey's friends were there.  She never saw him take an unusual interest in any of them or touch them in a sexual manner.

On the day Brandon was trying on clothes at the house, Petitioner was in the living room while Brandon was in the bathroom.  Petitioner did not help him or go into the bathroom.  At no time was Stacey, who was going back and forth between the living room and where her mother was helping dress Sarah, unable to see both Brandon and Petitioner.  She did not believe Brandon's parents were at the house.

The handcuffs seized during the search of Petitioner's residence belonged to Stacey.  Her parents found them when they were cleaning a house and gave them to her.  She used them for Halloween decorations and had them hanging on her bedroom door.  Petitioner kept them on the handlebars of his motorcycle for a short time as a decoration, but then returned them because he was getting rid of the motorcycle.  After she put the handcuffs on her door handle, she did not observe them to be gone for any period of time.  When Brandon came over, he sometimes played in her room.  The seized duffel bags also belonged to Stacey.  They were kept in the closet of the spare bedroom.  Petitioner never used them or kept duct tape in them.  Petitioner was a maintenance man who used tools in his work.  As part of his work, he normally carried duct tape.  It was kept in the garage.

Petitioner's wife, Barbara, recalled Lori being very friendly toward Petitioner on several occasions, until they had a verbal dispute over whether Lori's mother (Petitioner's sister) should be removed from life support.  Similarly, Becky and Petitioner had a normal father-daughter relationship.  Although Gayla did not have much contact with Petitioner, she did not try to hide or get away from him.  At one point, Gayla asked to go on a family trip with Barbara and Petitioner.  Terry had frequent contact with Petitioner, often bringing her baby over to play with Stacey.  Terry was friendly toward Petitioner until Barbara, who managed the apartment complex in which Terry lived, had to evict her for nonpayment of rent.  This appeared to create animosity on Terry's part toward both Barbara and Petitioner.

Kenneth first began to visit Petitioner and Barbara in 1985.  Kenneth did not want to visit, but came every other weekend because Barbara's children were there.  They never took Kenneth

camping; Barbara did not recall there ever being a time when Kenneth and Petitioner were alone together. Kenneth did not exhibit any fear or anger toward Petitioner, although Kenneth was living in Terry's apartment at the time Barbara's employer required her to evict them. When that happened, Terry and Kenneth approached Barbara and Petitioner in the parking lot, and Kenneth yelled at Petitioner that he would see to it Petitioner went to prison for the rest of his life. This was in December 1986. In 1995, after a long period of little or no contact, Kenneth telephoned Barbara and asked her to cosign so he could get a car. When she declined, he became upset and said she would be sorry.

Barbara--who had been married to Petitioner for 19 years--had never observed him to take an unusual sexual interest in young children or to engage in any type of sexual conduct with them. She and Petitioner purchased clothes for Brandon and Sarah on a number of occasions. These were always tried on at Petitioner's and Barbara's house. The time in December 1999 was the one occasion on which Brandon's parents did not come to the home at the same time as the children. The clothes were laid out on the bed in the spare bedroom. Brandon went into the bathroom to try on his clothes, while Barbara and Stacey remained in the bedroom to help Sarah with hers. Stacey was in and out, checking on Brandon. Petitioner was sitting on the couch, watching television. With respect to Brandon, Barbara knocked on the door and asked him how he was doing, but she never went in. Brandon always responded. As far as she knew, Petitioner never went into the bathroom with Brandon. To Barbara's knowledge, at no time did Petitioner assist Brandon in trying on the clothes. Barbara was present when Brandon came out to show the clothes to Petitioner. Petitioner never attempted to tuck in Brandon's shirt or to place his hand down Brandon's pants. Sufficient time never passed for Petitioner to have done what Brandon alleged without Barbara knowing.

No duct tape, condoms, balloons, or handcuffs were kept in the bathroom. Petitioner kept duct tape in his truck with his work tools, but there was no such tape inside the house. There were no pornographic materials in the home and had not been since around 1985, when Petitioner occasionally would rent some videos.

Prior to December 24, 1999, Petitioner and Barbara provided substantial assistance to Brandon's family. On that day, Barbara told Dusty and Lloyd that they would no longer be able to do

that.  Dusty and Lloyd were very angry and the threat was made that Barbara and Petitioner would never see the children again.

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).  Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

### II.  Legal Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.

1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III. Review of Petitioner's Claims**

    **A. Ground One**

Petitioner argues that his defense attorneys provided ineffective assistance. Petitioner claims that there were "irreconcilable differences" between his attorneys and that they failed to coordinate regarding a trial strategy. Petitioner further claims his attorneys failed to investigate and call certain favorable witnesses.

These claims were presented in an appeal to the California Court of Appeal, which affirmed the judgment in a reasoned opinion. (Lodged Doc. 7.) The issues were then raised in a petition for review to the California Supreme Court, which summarily denied review. (Lodged Doc. 8.) The California Supreme Court, by its "silent order" denying review, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claims, the Court of Appeal found that nothing in the record disclosed that either of Petitioner's defense attorneys had an actual conflict of interest that negatively affected their performance. The court further found that neither attorney was deficient in failing to call particular witnesses. (Lodged Doc. 7 at 18-22.)

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466

1  U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard
2  of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of
3  reasonable professional judgment considering the circumstances.  Id. at 688; United States v.
4  Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is
5  highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the
6  wide range of reasonable professional assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21
7  F.3d 1446, 1456 (9th Cir. 1994).

8  Second, the petitioner must demonstrate that "there is a reasonable probability that, but for
9  counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694.
10 Petitioner must show that counsel's errors were so egregious as to deprive the defendant of a fair
11 trial, one whose result is reliable.  Id. at 688.  The court must evaluate whether the entire trial was
12 fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78
13 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

14 A court need not determine whether counsel's performance was deficient before examining
15 the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at
16 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in
17 prejudice must necessarily fail.  However, there are certain instances which are legally presumed to
18 result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of
19 counsel or where the State has interfered with counsel's assistance.  Strickland, 466 U.S. at 692;
20 United States v. Cronic, 466 U.S. 648, 659 & n.25 (1984).  Ineffective assistance of counsel claims
21 are analyzed under the "unreasonable application" prong of *Williams v. Taylor*, 529 U.S. 362 (2000).
22 Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

23 1.  Conflict of interest

24 "[T]o demonstrate a violation of his Sixth Amendment rights, a defendant must establish that
25 an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446
26 U.S. 335, 350 (1980); see also Mickens v. Taylor, 535 U.S. 162, 170-74 (2002).  A mere "potential"
27 or "theoretical" conflict is insufficient to establish the presence of an actual conflict as required by
28 *Cuyler*.  Bonin v. Calderon, 59 F.3d 815, 827 (9th Cir. 1995).  "[T]o show adverse effect, a

defendant need not demonstrate prejudice--that the outcome of his trial would have been different but for the conflict--but only that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." U.S. v. Wells, 394 F.3d 725, 733 (9th Cir. 2005) (quotation marks omitted); see also Morris v. State of Cal., 966 F.2d 448, 455-56 (9th Cir. 1991) (stating that an actual conflict must be shown "through a factual showing on the record").

Here, Petitioner has not specifically identified what differences between his attorneys were "irreconcilable" or shown that any such difference constituted an actual conflict of interest that adversely affected his attorneys' ability to defend their portion of the case. He has also not identified any particular trial strategy his attorneys could have employed that was likely to affect the outcome of the trial.

2.  Failure to call certain witnesses

Petitioner claims that his counsel should have called Christine Butcher and Danielle Coulson as witnesses to contradict the testimony of Brandon Anderson and his father.

Brandon's father testified that, during a church potluck, Petitioner was in the restroom with Brandon. After Petitioner's wife went to check on them, she came back crying with her hands over her face, saying that she had a headache. (RT at 620-23.) Ms. Butcher states in her declaration that she was at the church potluck and she did not see Petitioner enter the bathroom with Brandon at any time. (Traverse, Decl. Christine Butcher.)

Brandon testified in detail that, while he was trying on clothes in Petitioner's bedroom, Petitioner took off his clothes, bound him with tape and handcuffs, and sodomized him. Petitioner then touched Brandon's penis with his hands and forced Brandon to touch Petitioner's penis. When Petitioner was finished, he threatened to hurt Brandon if he told anyone what had happened. (RT at 658-72.) Ms. Coulson states that she was at the house when the assault allegedly took place. She states that Brandon never entered the master bedroom, Petitioner never went to help Brandon try on clothes, and she did not observe anything that made her believe Brandon was assaulted. (Traverse, Decl. Danielle Coulson.)

Ms. Coulson's statements, however, are largely cumulative of the testimony given at trial. Stacey Howard testified that she was present at the house the entire time Brandon was trying on new clothes. She stated that Brandon changed in the bathroom while Petitioner waited in the living room. Brandon did not enter the bedroom to try on clothes and he and Petitioner were never alone long enough for an assault to take place. (RT at 982-92.) Barbara Howard similarly testified that Petitioner remained in the living room while Brandon tried on clothes in the bathroom. She stated that Petitioner never had an opportunity to assault Brandon and that she did not notice any signs of an assault. (RT at 1024-27, 1036-40.)

Calling Ms. Butcher and Ms. Coulson as independent witnesses would have bolstered Petitioner's defense. However, given the detailed testimony of the victim, and considering the cumulative nature of Ms. Coulson's statements, Petitioner has not shown a reasonable probability that calling the additional witnesses would have affected the outcome of the trial.

**B. Ground Two**

Petitioner argues that his rights were violated when evidence of time-barred incidents of child sexual abuse and animal cruelty were admitted into evidence. Petitioner claims that he should be retried using only the evidence relating to the timely allegations of abuse.

This claim was presented in an appeal to the California Court of Appeal, which affirmed the judgment in a reasoned opinion. (Lodged Doc. 7.) The issue was then raised in a petition for review to the California Supreme Court, which summarily denied review. (Lodged Doc. 8.) The California Supreme Court, by its "silent order" denying review, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the Court of Appeal found that evidence of the time-barred incidents of child sexual abuse would have been admissible under Evidence Code section 1108 even if Petitioner had not been charged for those incidents. The court explained that the prior incidents were "extremely probative" of Petitioner's past conduct and propensity to abuse children and not grossly unfair or inflammatory. (Lodged Doc. 7 at 23-35.)

"State prisoners are entitled to habeas relief under 28 U.S.C. § 2254 only if their detention violates the Constitution or a federal statute or treaty.  A state court's procedural or evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process." Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995) (citations omitted); see also Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000) ( "[A] violation of state law standing alone is not cognizable in federal court on habeas.").  "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

The state court's determination was not unreasonable, as the evidence relating to the time-barred incidents of sexual abuse was relevant to Petitioner's disposition and propensity to commit the other charged counts of sexual abuse.  Evidence Code section 1108 specifically provides for the introduction of such evidence.  See Cal. Evid. Code § 1108(a); People v. Britt, 104 Cal.App.4th 500, 505 (2002); People v. Medina, 114 Cal.App.4th 897, 904 (2003).  Further, the evidence relating to the time-barred incidents and animal cruelty was not so unfairly prejudicial or inflammatory as to deprive Petitioner of a fundamentally fair trial.

**C.  Ground Three**

Petitioner argues that his sentence of eighty-one years to life in state prison constitutes cruel and unusual punishment.

This claim was presented in an appeal to the California Court of Appeal, which affirmed the judgment in a reasoned opinion. (Lodged Doc. 9.)  The issue was then raised in a petition for review to the California Supreme Court, which summarily denied review. (Lodged Doc. 10.)  The California Supreme Court, by its "silent order" denying review, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the Court of Appeal found that his sentence was not disproportionate, as he was a recidivist sex offender who committed his current offenses against a

young and vulnerable victim. (Lodged Doc. 9 at 14-16.)

"The Eighth Amendment ... contains a narrow proportionality principle that applies to noncapital sentences. Under this narrow proportionality principle, the Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are grossly disproportionate to the crime. [¶] Although the Supreme Court has reviewed Eighth Amendment challenges to a number of state and federal sentences, it has struck down only two of them over the past century. In *Weems v. United States,* 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910), the Court invalidated under the Eighth Amendment a sentence of fifteen years in chains and at hard labor, plus permanent surveillance and civil disabilities, for the crime of falsifying a public document. Seventy-three years later, in *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Court invalidated under the Eighth Amendment a sentence of life imprisonment without the possibility of parole imposed under South Dakota law against a nonviolent recidivist whose final crime was writing a no account check with the intent to defraud." U.S. v. Angelos, 433 F.3d 738, 750 (10th Cir. 2006) (citations and quotation marks omitted).

"In contrast to these two cases, the Supreme Court has rejected Eighth Amendment challenges to the following sentences:

- A life sentence, with the possibility of parole, under a Texas recidivist statute for successive convictions of (1) fraudulent use of a credit card to obtain $80 worth of goods or services, (2) passing a forged check in the amount of $28.36, and (3) obtaining $120.75 by false pretenses. *Rummel v. Estelle,* 445 U.S. 263, 285, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).
- A forty-year sentence for possession and distribution of 9 ounces of marijuana. *Hutto v. Davis,* 454 U.S. 370, 375, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982).
- A life sentence, without the possibility of parole, for possession of more than 650 grams of cocaine. *Harmelin,* 501 U.S. at 1005, 111 S.Ct. 2680.
- A twenty-five year to life sentence imposed under a California recidivist statute for the offense of felony grand theft (i.e., stealing three golf clubs worth approximately $1,200). *Ewing,* 538 U.S. at 30-31, 123 S.Ct. 1179.

- Two consecutive twenty-five-year to life sentences under a California recidivist statute for two counts of petty theft. *Lockyer v. Andrade,* 538 U.S. 63, 77, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

Considered together, these cases clearly support the Supreme Court's recent statement in *Andrade* that [t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case." Id. at 750-51.

The state court's determination was not unreasonable, as Petitioner, who had previously been convicted of burglary and sexually abusing his daughter, was convicted of multiple sexual offenses against a young boy. (RT at 1340.) This is not an "extraordinary" case in which the sentence was grossly disproportionate to the crimes for which it was imposed. See U.S. v. Khan, 461 F.3d 477, 495 (4th Cir. 2006) ("The Supreme Court has never held that a sentence to a specific term of years, even if it might turn out to be more than the reasonable life expectancy of the defendant, constitutes cruel and unusual punishment.").

## IV.  Certificate of Appealability

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 123 S.Ct. 1029, 1039 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant

has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253.

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 123 S.Ct. at 1034; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 123 S.Ct. at 1040.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. The Petition for Writ of Habeas Corpus is DENIED with prejudice;

2. The Clerk of Court is DIRECTED to enter judgment; and

3. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

**Dated:   November 18, 2008**          **/s/ John M. Dixon**
                              UNITED STATES MAGISTRATE JUDGE